**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,                                    Case No. 25-cr-7 (DSD/DJF)

                            Plaintiff,

                                                             **REPORT AND RECOMMENDATION**

    v.

Justin Anthony Kudla,

                            Defendant.

On January 8, 2025, a federal grand jury indicted Defendant Justin Anthony Kudla on one count of Interference with Federally Protected Activities and one count of engaging in a Hate Crime. (*See* ECF No. 1.) The Indictment alleges that Mr. Kudla "willfully injured, intimidated and interfered with" a black man because of his race, and because the man was enjoying the services of a bar that serves the public. (*Id.*) The Indictment further charges that Mr. Kudla "willfully caused bodily injury" to the alleged victim because of his race. (*Id.*)

This matter is before the Court on Mr. Kudla's Motion to Suppress Statements ("Motion") (ECF No. 23). The Court held a hearing on Mr. Kudla's Motion on March 12, 2025. (*See* ECF No. 31.) During the hearing, the Court received body-worn camera video into evidence. (*See id.*; Gov't Ex. 1.) The Court also heard testimony from one witness, Belle Plaine Police Department Officer Kory Sames. (*See id.*) Based on the parties' written submissions, the hearing testimony and exhibits, and on the entire file, the Court recommends that Defendant's Motion be granted in part and denied in part.

1

## I.    BACKGROUND

### A.    Home Interrogation and Arrest

While on patrol, Officer Sames received a report of an assault that resulted in the victim being hospitalized.  (*See* ECF No. 37 at 6-7.)  After some investigation, Officer Sames identified Mr. Kudla as a suspect and went to Mr. Kudla's residence with Detective Sterling Cayer to investigate further.  (*Id.* at 7-8.)  Officer Sames knocked on the front door of the home as a dog barked from inside.  (*See* Gov't Ex. 1 at 17:06:29.)[1]

Lisa Marie Bowers (Mr. Kudla's mother) answered the door and greeted the officers.  (*See id.* at 17:06:42.)  After asking Ms. Bowers how she was doing, Officer Sames asked her if Mr. Kudla was home.  (*Id.* at 17:06:45.)  She confirmed that he was.  (*Id.* at 17:06:49.)  Officer Sames asked if he could talk to Mr. Kudla.  (*Id.* at 17:06:51.)  She said she could go get him and asked, "What's this [about]—none of my business?"  (*Id.* at 17:06:52.)  Officer Sames said the police just wanted to talk to him.  (*Id.* at 17:06:57.)  Ms. Bowers started going back into the home when Detective Cayer asked her if the officers could enter.  (*Id.* at 17:06:59.)  Officer Sames also asked if the dog inside the home was friendly.  (*Id.* at 17:07:03.)  She responded, "We'll find out," and opened the door more widely for the officers to step in.  (*Id.* at 17:07:04.)  The officers expressed some concern, but then she smiled and confirmed that she was joking.  (*Id.* at 17:07:06.)  Leaving the front door wide open for the officers, Ms. Bowers went inside to get Mr. Kudla.  (*Id.* at 17:07:09.)

The officers entered the home and saw Ms. Bowers' boyfriend, David Leslie Groves, sitting in a lounge chair watching television news coverage of a criminal legal proceeding.  (*Id.* at

---

[1] The Court cites to the date and time of day stamp in the upper right corner of Government Exhibit 1; not the video playback time at which the cited portion of the video appears.

17:07:11.) The officers and Mr. Groves greeted each other. (*Id.* at 17:07:15.) Once inside, the officers stood just inside the front door. (*Id.* at 17:07:20.) Ms. Bowers called her son's name from the top of the basement stairs and asked him, "What is going on? The cops are here." (*Id.* at 17:07:14-18.) The officers waited by the door for Mr. Kudla to come upstairs and exchanged small talk with Mr. Groves about the weather and the dog. (*Id.* at 17:07:34-08:00.)

After a few exchanges with Ms. Bowers, Mr. Kudla eventually came up the basement stairs wearing a robe and no eyeglasses. (*Id.* at 17:08:00.) Officer Sames asked him how he was doing. (*Id.* at 17:08:01.) Mr. Kudla said he was "good." (*Id.* at 17:08:02.) Officer Sames then asked Mr. Kudla, "You got time now to have a conversation with me?" (*Id.* at 17:08:05.) Mr. Kudla asked why the officers were there. (*Id.* at 17:08:08.) Officer Sames stated, "Friday night." (*Id.* at 17:08:10.) After Mr. Kudla expressed confusion, Officer Sames asked, "Were you not involved in a fight Friday?" (*Id.* at 17:08:13-18.) Mr. Kudla denied any involvement. (*Id.* at 17:08:18.) Officer Sames asked Mr. Kudla several times to confirm his answer, and each time, Mr. Kudla gave the same response. (*Id.* at 17:08:19-23.) Officer Sames then asked where Mr. Kudla was on Friday night. (*Id.* at 17:08:24.) Mr. Kudla gave a list of locations. (*Id.* at 17:08:25-31.) Officer Sames asked Mr. Kudla to again confirm that he was not in a fight at any of those locations. (*Id.* at 17:08:32.) Mr. Kudla again denied participation in a fight and showed the tops of his hands to demonstrate that he was not in a fight recently. (*Id.* at 17:08:32-36.) Officer Sames asked why people would "bring up" his name if he wasn't involved. (*Id.* at 17:08:37.) Mr. Kudla responded, "I have no idea," and shook his head. (*Id.* at 17:08:40.)

Officer Sames asked Mr. Kudla where his glasses were and confirmed that Mr. Kudla wore glasses. (*Id.* at 17:08:42.) Mr. Kudla offered to go get them. (*Id.* at 17:08:45.) Officer Sames replied, "No, that's fine." (*Id.* at 17:08:46.) Turning towards the stairs and walking, Mr. Kudla

said, "I'll go grab 'em." (*Id.* at 17:08:47.) Officer Sames stood still and said, "No, that's fine. We don't need 'em now." (*Id.* at 17:08:48.) Mr. Kudla turned back around and walked toward the officers. (*Id.* at 17:08:48-51.)

Officer Sames again asked if Mr. Kudla was involved in a fight, and again, Mr. Kudla denied it. (*Id.* at 17:08:51-53.) "And that's the story you want to stick to?" asked Officer Sames. (*Id.* at 17:08:54.) "Yes," replied Mr. Kudla. (*Id.* at 17:08:55.) Following that response, Officer Sames said, "Okay," and placed Mr. Kudla under arrest. (*Id.* at 17:08:57.) The entire conversation between Officer Sames and Mr. Kudla before Mr. Kudla's arrest lasted less than a minute. Ms. Bowers and Mr. Groves were both present the entire time.

### B.    Police Station Interrogation

The officers then drove Mr. Kudla to the police station in a police cruiser and escorted him into an interrogation room. (*Id.* at 17:22:58-26:00.) Once inside, Officer Sames asked Mr. Kudla if he was willing to talk. (*Id.* at 17:26:02.) Mr. Kudla responded, "Probably not," and then briefly mentioned his past experiences talking to the police. (*Id.* at 17:26:04-10.) Officer Sames replied that he would nonetheless give a *Miranda* warning to Mr. Kudla and offer Mr. Kudla "the opportunity to tell [his] side of the story with [Officer Sames]." (*Id.* at 17:26:11-18.) The officers brought Mr. Kudla a cup of water and removed his handcuffs so he could drink from it. (*Id.* at 17:26:23-27:07.)

Unprompted, Mr. Kudla asked if the police officers could take pictures of his hands. (*Id.* at 17:27:08-13.) Officer Sames agreed to do so but said he would prefer to give a *Miranda* warning first. (*Id.* at 17:27:14-27.) Officer Sames then reviewed his notes and asked Mr. Kudla about past work experience in farming. (*Id.* at 17:27:35-48.) Mr. Kudla suggested the police may have received incorrect information about him. (*Id.* at 17:27:48-59.) Officer Sames then asked how

4

long Mr. Kudla had lived in Belle Plaine, and Mr. Kudla responded, "Off-and-on for about three years." (*Id.* at 17:28:00-02.) The two men also talked briefly about a past police encounter related to someone prank calling Mr. Kudla. (*Id.* at 17:28:05-34.)

Finally, Officer Sames gave a *Miranda* warning to Mr. Kudla. (*Id.* at 17:28:41-29:18.) Officer Sames then confirmed that Mr. Kudla understood his *Miranda* rights and asked him if he wished to talk to the police. (*Id.* at 17:29:18-24.) After taking a few seconds to consider it, Mr. Kudla responded, "To a certain point, but it might not be long." (*Id.* at 17:29:24-33.)

Officer Sames asked Mr. Kudla, "If you want to speak with me, feel free to tell me what happened. That's up to you." (*Id.* at 17:29:36-42.) Mr. Kudla asked about the subject of the interview and who was involved, and Officer Sames replied that it concerned a fight on Friday night that involved "Benjamin". (*Id.* at 17:29:43-53.) Mr. Kudla confirmed he knew Benjamin and said he heard Benjamin was spreading a rumor that Mr. Kudla had called Benjamin "the n-word." (*Id.* at 17:29:53-30:26.) Mr. Kudla also said he had not had issues with Benjamin in the past and had shared pictures of his hands with other people to prove he was not involved in a fight. (*Id.* at 17:30:28-31:23.) Mr. Kudla asked the police whether Benjamin was hospitalized, which Officer Sames confirmed. (*Id.* at 17:31:28-30.) Mr. Kudla stated he had heard Benjamin was taken to the hospital and asked, "And people are saying that I beat him up? If I beat—like you can look"; Mr. Kudla gestured to himself to show that he did not have physical signs of having beaten someone up. (*Id.* at 17:31:31-50.) He also asked the police to take pictures of his body. (*Id.* at 17:31:53-32:05.) Officer Sames took photos of Mr. Kudla and continued to ask questions about what happened Friday night. (*Id.* at 17:32:05-33:00.) Mr. Kudla said Benjamin followed him out the door of a bar that night as Mr. Kudla went to another bar. (*Id.* at 17:32:15-58.)

At that point in the interview, Mr. Kudla exercised his right to speak with an attorney. (*Id.* at 17:32:59-33:03.) Officer Sames responded, "Ok, well then we'll stop," turned off his recorder, and terminated the interrogation. (*Id.* at 17:33:03-08.)

## II.   DISCUSSION

Mr. Kudla moves to suppress the statements he made to the police: (1.) at his home, on the ground that he was in custody when the officers questioned him without a *Miranda* warning (*see* ECF No. 45 at 7); (2.) at the police station before he received a *Miranda* warning (*see* ECF No. 45 at 17); and (3.) at the police station after he received *Miranda* warning, on the ground that he did not validly waive his *Miranda* rights (*see id.*). The Court recommends that only a portion of Mr. Kudla's pre-*Miranda* statements at the police station be suppressed.

### A.   Legal Standards

The law governing the suppression of statements is well-settled. Non-custodial, voluntary statements are generally admissible. *See United States v. Baswell*, 792 F.2d 755, 759 (8th Cir. 1986). Custodial statements that a person volunteers when he is not being explicitly or implicitly interrogated by the police are also generally admissible. *See Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980). But "[w]hen a suspect is interrogated in a custodial setting, the police must advise him of his right not to answer questions and to have an attorney present during questioning," i.e., the police must give a *Miranda* warning. *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

A person is in a custodial setting when he is formally arrested or when his "freedom of movement is restricted to a degree akin to a formal arrest." *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). In the Eighth Circuit, courts consider the following non-

exhaustive list of factors in determining whether a suspect is in a form of custody akin to formal arrest:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).  In evaluating these factors, a court does not resolve the question simply because a greater number of factors supports a particular outcome; a court must consider the totality of the circumstances and weigh the factors accordingly. *See United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004).  "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest."  *Id.* at 828.

The *Miranda* warning is a "prophylactic" measure meant to protect a person's Fifth Amendment right against self-incrimination by dispelling the inherently coercive nature of custodial interrogations.  *See New York v. Quarles*, 467 U.S. 649, 654 (1984).  In most circumstances, a warning accomplishes this goal.  *See id.*  Even when police fail to provide a *Miranda* warning before securing an initial statement during a custodial interrogation, a subsequent *Miranda* warning "should suffice to remove the conditions that precluded admission of the earlier statement" and make any subsequent statements admissible.  *Oregon v. Elstad*, 470 U.S. 298, 314 (1985).  But when police *deliberately* employ strategies to undermine the effectiveness of a *Miranda* warning, such methods may render the warning ineffective and the defendant's statements inadmissible.  *See Ollie*, 442 F.3d at 1142; *Missouri v. Seibert*, 542 U.S.

600, 622 (2004) (Kennedy, J., concurring in the judgment).  When a defendant moves to suppress his statements because the police employed such a technique, "the prosecution must prove, by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent *Miranda*."  *Ollie*, 442 F.3d at 1142-43.

### B.    Analysis

#### 1.    Home Interrogation

Although some of the *Griffin* factors suggest the law enforcement questioning of Mr. Kudla at his home was custodial, the Court believes other considerations weigh more heavily against that conclusion.  As Mr. Kudla points out, the police did not tell him he was not under arrest or that he was free to leave.  *See Griffin*, 922 F.2d at 1349 ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody … is for police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.")  But the officers asked him if he was willing to answer their questions, and he voluntarily approached them without the police making any demands or threats against him.  (*See* Gov't Ex. 1 at 17:08:05-10.)  Thus, even though the officers "did not expressly tell [Mr. Kudla] his participation was voluntary or that he was free to leave, nothing about the circumstances or the [officers'] actions indicated otherwise."  *United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016).

Moreover, it is clear from the video that the officers did not restrain Mr. Kudla's freedom of movement in any way.  Mr. Kudla argues that the officers made a "show of authority" in his home and that they "twice verbally prevented him" from going to get his glasses.  (*See* ECF No. 45 at 10-11.)  First, the officers' mere presence inside the home in uniform does not constitute a show of authority that would have made a reasonable person feel that they had to submit to the

officer's invitation to speak with them. *See United States v. Barnum*, 564 F.3d 964, 970 (8th Cir. 2009) (collecting cases) (stating mere presence of two to three officers, in the absence of evidence of threats or intimidation, would not cause a reasonable person to feel that they had to comply with a request). Mr. Kudla argues the officers engaged in a show authority by standing by the front door inside his home (*see* ECF No. 45 at 10, 13), but the Court disagrees. There is no dispute that Mr. Kudla's mother invited them in. And once inside, the officers did not attempt to move about the home or approach him; instead, they respectfully stood by the door and engaged in small talk with Mr. Groves while they passively waited to be approached. Second, the evidence does not support an inference that the officers prevented Mr. Kudla from leaving. When Mr. Kudla twice offered to retrieve his glasses, the officers simply declined the invitation both times. (Gov't Ex. 1 at 17:08:42-51.) They did not tell Mr. Kudla to stay where he was, attempt to follow him, or make any other gestures implying that Mr. Kudla was not free to retrieve his glasses, leave the room, or terminate the discussion.

Mr. Kudla further argues that his responses were not voluntary because the officers came into his home unexpectedly. (*See* ECF No. 45 at 13.) But the fact that their arrival was unexpected does not change the conclusion that their mere presence in the home was insufficient to render the questioning "custodial". *See United States v. Jones*, No. 19-CR-341 (NEB/LIB), 2021 WL 960910, at *2 (D. Minn. Mar. 15, 2021) (finding mere fact "that police arrived at [defendant's] mother's house unannounced" does not necessarily mean that defendant would feel unable to end the encounter).

There is also no evidence of any strongarm tactics or deceptive stratagems. Mr. Kudla asserts that their failure to provide a *Miranda* warning qualifies. The Court is not persuaded by this circular argument. The *Griffin* factors are only relevant to the question of whether a *Miranda*

9

warning is necessary in the first place. Mr. Kudla appears to argue that a *Miranda* warning was necessary *because* no warning was given. Were the Court to accept Mr. Kudla's argument, this factor would always weigh in favor of suppression, but that is clearly not the case. *See, e.g.*, *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (finding police did not use strongarm tactics or deceptive stratagems when they executed a search warrant at defendant's home and did not give *Miranda* warning to him during the search). Such a holding would render this *Griffin* factor meaningless, and the Court declines to assume that the Eighth Circuit provided meaningless guidance.

Furthermore, Mr. Kudla's home was not a police-dominated environment. Courts have consistently found that interrogations at a defendant's home are *less* likely to be police-dominated than in other places. *See Czichary*, 378 F.3d at 826-27. Mr. Kudla's mother and her boyfriend's presence during the entire interaction, along with their barking dog, further diffused the coercive nature of the environment. *See United States v. Mekonnen*, No. 07-CR-165 (ADM/JSM), 2007 WL 9717949, at *5 (D. Minn. Oct. 23, 2007). The Court also disagrees with Mr. Kudla's description of the interaction as being police-dictated. (*See* ECF No. 45 at 15.) The police asked Mr. Kudla if he wanted to speak with them and then asked him a few questions over the course of less than a minute. (Gov't Ex. 1 at 17:08:00-57.) This hardly amounts to a degree of control akin to a formal arrest.

Even though Mr. Kudla was arrested at the end of the interrogation at his home, the Court concludes, based on the totality of the circumstances, that he was not "restrained as though he were under formal arrest" prior to that moment. *Czichray*, 378 F.3d at 828. The Court thus recommends that his motion to suppress the statements he made at the home be denied.

### 2.     Police Station Interrogation

Mr. Kudla undoubtedly was in police custody when Officer Sames interviewed him at the police station.  *See Ollie*, 442 F.3d at 1137.  Though Officer Sames read Mr. Kudla his *Miranda* rights shortly before he made most of his statements, Mr. Kudla argues the *Miranda* warning was ineffective.  (*See* ECF No. 45 at 18.)  Specifically, Mr. Kudla argues that the police used a "two-step" interrogation method (*id.*), which involves: (1.) the police eliciting incriminating statements while purposefully withholding a *Miranda* warning; and then (2.) administering a *Miranda* warning and coaxing the defendant to restate their pre-*Miranda* statements.  *See United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007) (citing *Seibert*, 542 U.S. at 604-06, 617).  When this tactic is intentionally deployed, it unduly undermines the effectiveness of the *Miranda* waiver and warrants suppression of the post-*Miranda* statements.  *Id.* at 621-22 (Kennedy, J., concurring in the judgment).

The government disputes that the police used the two-step method (*see* ECF No. 46 at 21). The government further argues that some of Mr. Kudla's statements prior to the *Miranda* warning were unprompted and should not be suppressed for that reason (*see id.* at 20).

### i.     Effectiveness of the *Miranda* Warning

The effectiveness of Mr. Kudla's *Miranda* warning thus turns on whether the police intentionally employed the two-step interrogation method in questioning him.  *See Ollie*, 442 F.3d at 1142.  It is the government's burden to prove by a preponderance of the evidence that the police did not intentionally deploy such a tactic.  *See id.* at 1142-43.

Based on the testimony and the exhibit received into evidence at the hearing, in addition to the arguments of counsel, the Court finds the government has satisfied its burden.  As a threshold matter, for the foregoing reasons the Court finds Mr. Kudla's statements during questioning at his

home are admissible.  Whether he repeated those same statements after receiving a *Miranda* warning is thus of little consequence.

Moreover, whatever strategy Officer Sames deployed when he interrogated Mr. Kudla—first at Mr. Kudla's home and later at the station house—it was not the two-step method.  At Mr. Kudla's home, Officer Sames generally repeated the same targeted question about whether Mr. Kudla was involved in a fight on Friday night.  (*See* Gov't Ex. 1 at 17:08:00-57.)  In the station house, Officer Sames asked questions about Mr. Kudla's background and residence, provided a *Miranda* warning, and then started the post-*Miranda* interrogation with an open-ended statement that he was affording Mr. Kudla the opportunity to tell his side of the story.  (*See id.* at 17:26:11-18.)  At no point during the second interrogation did Officer Sames confront Mr. Kudla with his prior statements.  If Officer Sames was trying to utilize the two-step method to extract duplicative statements, he would have: (1.) asked Mr. Kudla to reaffirm the statements he made earlier; (2.) asked leading questions in the second interrogation that would have invited Mr. Kudla to repeat the same statements he made before; or (3.) at minimum, asked the same questions from the first interrogation during the second interrogation.  *See United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007) (finding no deliberate two-step strategy was used when there was no evidence that officers confronted the defendant with his prior statement in order to have it repeated); *see also Seibert*, 542 U.S. at 621 (Kennedy, J., concurring in the judgment) (describing two-step strategy as involving the officer confronting "the defendant with her inadmissible prewarning statements and push[ing] her to acknowledge them").  Yet, none of those questioning methods were used.  Additionally, the brevity of these interactions undermines any assertion that the police were engaging in a tactic to pressure Mr. Kudla to give a particular statement during the first interrogation and then give the same statement during the second interrogation.  *See United States*

*v. Rooney*, 63 F.4th 1160, 1167 (8th Cir. 2023) (finding brevity of six-and-a-half minute long

questioning during initial interrogation undermined defendant's assertion that intentional two-step

technique was used); *United States v. Materas*, 483 F.3d 27, 33 (1st Cir. 2007) (affirming finding

that brief questioning followed by defendant's relocation and administration of *Miranda* warning

demonstrated no intent to purposefully undermine *Miranda*).  The record thus reflects, by more

than a preponderance of the evidence, that Officer Sames did not use the two-step method.

Furthermore, there is no evidence in the record suggesting the police *intentionally* sought

to undermine the effectiveness of the *Miranda* warning they gave.  Mr. Kudla appears to argue

that, because Officer Sames is a police officer with twenty years of experience, he should have

known better.  (*See* ECF No. 45 at 19.)  But even gross negligence is not enough for suppression

in these circumstances; rather, the police must have *purposefully* tried to undermine *Miranda*.  *See*

*Ollie*, 442 F.3d at 1142-43.  The evidence does not support that inference.  *Cf. Seibert*, 542 U.S.

at 610 (recounting how officer at police department relevant to the case was instructed to employ

a two-step interrogation technique with the goal of undermining the effectiveness of *Miranda*).

The Court thus concludes that the police did not intentionally use the two-step method or

any other tactic that would render Mr. Kudla's *Miranda* warning ineffectual.  Mr. Kudla's motion

to suppress his statements during the post-*Miranda* portion of the stationhouse interrogation should

be denied for these reasons.

### ii.    Pre-*Miranda* Statements

Mr. Kudla also seeks to suppress the statements he made during the stationhouse

interrogation before Officer Sames provided the *Miranda* warning.  (*See* ECF No. 45 at 1-2.)  Since

Mr. Kudla plainly was in custody when he made the statements, suppression is required absent an

applicable exception to the *Miranda* rule.  The only such exception the government proffers is that

some of the statements Mr. Kudla made were unprompted and spontaneous.  (*See* ECF No. 46 at 20-21.)  "Voluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings."  *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016).  Prior to receiving the *Miranda* warning, Mr. Kudla asked Officer Sames to take photos of his hands as evidence that he had not recently been in a fight.  (Gov't Ex. 1 at 17:27:08-21.)  Officer Sames neither said nor did anything to prompt Mr. Kudla to make this request.  Because these statements were not the product of police interrogation, the Court recommends Mr. Kudla's motion to suppress them be denied.

However, Officer Sames also asked Mr. Kudla several questions before he administered the *Miranda* warning.  (*See id.* at 17:26:02-10, 17:27:35-28:05.)  It is unclear whether the government intends to offer any of these statements,[2] and the government proffers no ground for admitting them though it bears the burden of proving their admissibility.  *See J.D.B. v. North Carolina*, 564 U.S. 261, 269-70 (2011).  Since Mr. Kudla plainly was in custody when he made the statements without having received the required warning, and the government has not even attempted to satisfy its burden of proof, they should be suppressed.  The Court therefore recommends Mr. Kudla's motion be granted with respect to the statements he made after his arrest and before Officer Sames administered the *Miranda* warning (Gov't. Ex. 1 at 17:08:58-17:29:18), except for his spontaneous request to photograph his hands (Gov't Ex. 1 at 17:27:08-21).

---

[2] The government represents that it "no longer intends to affirmatively offer" the statements at 17:26:02-10.  (*See* ECF No. 46 at 3 n.1.)  Except for those statements and Mr. Kudla's unprompted request to photograph his hands, the government's response does not clarify which statements it intends to offer from the period after Mr. Kudla's arrest and before he received the *Miranda* warning.  (Gov't. Ex. 1 at 17:08:58-17:29:18.)

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Justin Anthony Kudla's Motion to Suppress Statements (ECF No. 28) be **GRANTED IN PART** as to Gov't Ex. 1 at 17:08:58-17:27:08 and 17:27:21-17:29:18, and otherwise **DENIED**.

Dated: May 20, 2025                    *s/ Dulce J. Foster*
                                        Dulce J. Foster
                                        United States Magistrate Judge

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).